# EXHIBIT C

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF OREGON

3               PORTLAND DIVISION

4

5   UNITED STATES OF AMERICA,        )
                                     )
6                     Plaintiff,     )   No. 3:22-mj-00009-1
                                     )
7            vs.                     )   January 20, 2022
                                     )
8   MARCO SANTILLAN, JR.,            )   Portland, Oregon
                                     )
9   _____Defendant.____   )

10

11

12

13            TRANSCRIPT OF PROCEEDINGS

14        (Rule 5/Detention Hearing by Video)

15

16     BEFORE THE HONORABLE JOHN V. ACOSTA

17   UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

18

19

20

21

22

23   Court Reporter:         Ryan White, RMR, CRR, CSR/CCR
                             United States District Courthouse
24                           1000 SW 3rd Avenue, Room 301
                             Portland, Oregon 97204
25                           (503) 326-8184

```
 1                              APPEARANCES

 2

 3   For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                               By:  MIRA CHERNICK (by video)
 4                             mira.chernick@usdoj.gov
                               1000 SW 3rd Avenue, Suite 600
 5                             Portland, Oregon 97204
                               (503) 444-0903
 6

 7   For the Defendant:        FEDERAL PUBLIC DEFENDER'S OFFICE
                               By:  ROBERT B. HAMILTON (by video)
 8                             robert_hamilton@fd.org
                               101 SW Main Street, Suite 1700
 9                             Portland, Oregon 97204
                               (503) 326-2123
10

11   Pretrial Officer:         Kevin McGlothen (by phone)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (January 20, 2022; 1:35 p.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  Ms. Chernick, call the case.

6          MS. CHERNICK:  Good afternoon, Your Honor.  Mira

7    Chernick for the United States.  This case is United States

8    versus Marco -- is there a whine happening?

9          THE COURT:  Yes.  Ms. Chernick, your volume was very

10   low.  We turned up our volume on our side and that's what's

11   giving us the feedback.  Could you increase your volume a bit,

12   please.

13         MS. CHERNICK:  Is this any better?  I'm sorry.  I'm on

14   headphones.

15         THE COURT:  Yes.  Thank you.

16         MS. CHERNICK:  Okay.  I'll hold it up.

17         THE COURT:  Thank you.

18         MS. CHERNICK:  Should I start over, Your Honor?

19         THE COURT:  Yes.

20         MS. CHERNICK:  Mira Chernick for the United States.

21   Good afternoon.

22         This case is United States versus Marco Santillan,

23   Jr., case number 3:22-mj-9.  We're here for a detention hearing

24   on a Rule 5 out of the Central District of California.

25         The government recently filed a detention memo.  I do

1    apologize for that late filing.  It was based on some new

2    information I received today.  And the pretrial services officer

3    has also filed an updated memorandum, and the government is

4    ready to proceed.

5         THE COURT:  Thank you.

6         Mr. Hamilton, have you had a chance to review the

7    government's memo on detention?

8         MR. HAMILTON:  I have, Your Honor, and I've reviewed

9    the presentence report, and I've also submitted an updated

10   Rule 5 waiver to replace the one I filed yesterday.

11        THE COURT:  Let's start there.

12        I do have the Rule 5 waiver here.

13        Mr. Santillan, I have before me a document entitled

14   Waiver of Rule 5 and 5.1 hearings.  It has the case number in

15   this district and it also bears the case number in the charging

16   district in California.  It appears to bear your signature.

17        Did you sign this document earlier today?

18        THE DEFENDANT:  Yes, I did, sir.

19        THE COURT:  If you had questions about this document

20   and its significance, was Mr. Hamilton able to answer those

21   questions to your satisfaction?

22        THE DEFENDANT:  Yes.

23        THE COURT:  Thank you.

24        I'll receive the waiver.  That will go in the case

25   docket here in this district as well as in the charging

1    district.

2          Mr. Hamilton, my understanding is now that the only

3    other discussion to have is about detention or release, and you

4    are seeking release; correct?

5          MR. HAMILTON:  That is correct, Your Honor.  We agree

6    with pretrial's recommendation and the conditions they suggest.

7          THE COURT:  Let me start with this question before I

8    hear from the government.

9          It's not unusual, of course, on our docket to have

10   cases involving firearms, felon in possession of a firearm or

11   straw purchases of firearms that involve perhaps a dozen

12   firearms or more.  Or someone who has a stolen firearm or an

13   unregistered machine gun, sometimes we see that too.  This case

14   seems a little different to me.

15         We have -- I don't know of a -- I don't know of a more

16   accurate way to put it.  The government's evidence shows that

17   Mr. Santillan had an arsenal and that he was in possession of

18   enough rounds of ammunition for these firearms that suggest he

19   wasn't stocking up to go to the shooting range.  So that gives

20   me significant concern, particularly coupled with the fact that

21   these charges arise from conduct that occurred while he already

22   was pending charges.

23         So you will need to address those issues before I hear

24   from the government, please.

25         MR. HAMILTON:  Okay.  Thank you, Your Honor.

1              In looking at the -- at the indictment, I think one

2   important understanding of the indictment is that it's got his

3   father -- and I'm going to say his biological father because his

4   adoptive parents are -- his grandparents have adopted him when

5   he was 13.  But his biological father is, like, the central

6   figure in this conspiracy which occurs between -- roughly

7   between March 2020 and February 2021.

8              I mean, the gist of the conspiracy, as the Court

9   indicates, is firearms and firearm parts are purchased and then

10  they're gathered and sent to Mexico.  As I read the indictment,

11  what it reflects is different individuals were doing -- working

12  for Santillan, Sr., and my client is Santillan, Jr., and these

13  parts and guns were gathered in Whittier, California, typically,

14  and then Santillan, Sr., would arrange to have those go to

15  Mexico.

16             As I read through the indictment, the allegations in

17  the indictment about communications, the only communications

18  Mr. Santillan, Jr., are are with his father and taking direction

19  on what to get and where to go.  And there is no indication that

20  Mr. Santillan, Jr., has any contacts with folks in Mexico or is

21  collecting the money from Mexico.  Mr. Santillan, Jr.'s, conduct

22  is alleged to be with his father, Santillan, Sr.

23             I would note that in the indictment -- and so

24  those -- page 7, page 8 in the indictment, page 9, all of them

25  are contacts between Santillan, Sr., and Santillan, Jr., and

1    they're directions on what Santillan, Jr., is supposed to be

2    doing.

3            I would note that on page 12 of the indictment,

4    there's a description in paragraph 32 on July 31st, 2020, in

5    Nevada, the agents raid the house in Pahrump, Nevada.  That's

6    where Santillan, Jr., is living, and they find a number of items

7    at that house.

8            And then on the following page, in paragraph 33, it

9    talks about on August 5th, 2020, Santillan, Sr., has a phone

10   call with Marmolejo, another co-defendant who also lived at this

11   residence, and they discussed the seizure of ammunition and

12   other property by law enforcement on July 31st, 2020, and

13   Defendant Santillan, Sr., instructed Defendant Marmolejo to

14   contact the sheriff's department to inquire about the seized

15   property.  In the next paragraph, Marmolejo, on the same date,

16   tells Santillan, Sr., they can't get it back, and Santillan says

17   they, quote, took all our cash.

18           After that incident, as you keep reading the

19   allegations, Santillan, Jr., does not appear anymore in the

20   communications of the case.  It becomes Santillan, Sr., and

21   Marmolejo who have contacts with each other.

22           I understand that in this period of mid 2020, I think

23   the -- he's not convicted in Oregon in the state case until

24   September 8th, 2020, so it's after this seizure occurs in

25   Nevada.

1           The other important thing I'd like to note about the

2    seizure so I don't forget later is that Mr. Santillan, Jr., was

3    aware of this investigation.  There was this seizure at his

4    house.  They had been questioning his biological father for,

5    like, over a year.  He knows about this case.  He hasn't run to

6    Mexico.  He's not living under an assumed name.  He's here in

7    Oregon reporting to probation under his real name, working under

8    his real name, living under his real name knowing this federal

9    investigation was going on.

10           The other thing I would note is there was

11    one -- there's one -- there's another seizure on January

12    7th -- I'm sorry -- January 11th, 2021, and it's by the Nevada

13    Department of Public Safety.  Mr. Santillan, Jr., at that point

14    is in custody for his December drug case in Nevada, and my

15    understanding is that they were going to check out the house and

16    it's his house where Marmolejo lives and items were found at

17    that house before his release.  He was not out of custody during

18    that time period and you'll see no discussion of communications

19    regarding Santillan, Jr., during that time period in the

20    indictment.

21           And so while I understand the Court's concerns about

22    the nature of the charges, I would like the Court just to

23    consider the allegations as set forth by the indictment, and in

24    the indictment -- that, I think, reflects his role as somebody

25    that is working for somebody else and following someone else's

1    instructions, namely his biological father, which is

2    disappointing.  But he is not alleged to be the central figure

3    in this and he fades from the indictment in July of 2020 and

4    early August 2020.

5            And so in response to the Court's questions on the

6    nature of the allegations, I have that.  And I can go further

7    about other circumstances, but if you wanted to start with that,

8    I can stop there.

9            THE COURT:  No, that's fine.

10           Let me hear from the government, Ms. Chernick.

11           MS. CHERNICK:  Your Honor, I think your

12   characterization of this case -- I'm sorry.  Can you hear me or

13   should I hold the microphone up?

14           THE COURT:  I can hear you fine.  Thank you.

15           MS. CHERNICK:  Okay.  I think your characterization of

16   this case is spot-on.  This was not an incident where a

17   defendant is asked to pick up a box by someone or even multiple

18   boxes where a defendant is just following orders.

19           Mr. Hamilton's characterization is accurate to the

20   extent there were communications between the defendant and his

21   father in which the defendant was directed by his father, but

22   the extent of his involvement in this conspiracy goes far beyond

23   someone who was simply following orders or didn't know the full

24   extent of what they were participating in.

25           As you noted, the quantity of ammunition and guns and

1    the nature of that ammunition and those guns was extremely

2    dangerous.  His involvement in the conspiracy lasted months and

3    involved accumulating, as you described accurately, an arsenal,

4    which he knew would be transported to Mexico and which he helped

5    plan to transport to Mexico to supply to a Mexican drug cartel,

6    and the danger of that I think you have an understanding of.

7         As to the timing of it, as Your Honor accurately

8    noted, the defendant was facing pending charges on a drug

9    trafficking case while he was participating in this conspiracy.

10   Mr. Hamilton says that the defendant fades from the indictment

11   after July of 2020, but then also notes that there was a seizure

12   of multiple -- tens of thousands of rounds of ammunition from

13   the defendant's residence in January of 2021 after he had been

14   convicted of the state drug trafficking count.

15        I don't have further information about during what

16   time period the defendant was in custody, but the fact remains

17   that he remained in possession of thousands of rounds of

18   ammunition that was part of this conspiracy and intended to be

19   supplied to promote drug and violent activity in Mexico.

20        And the relevant question here, I think, is not who

21   was leading this entire conspiracy, but what was the nature of

22   the defendant's participation in this conspiracy, and the nature

23   of that participation was that it was extensive, it was very

24   dangerous, it was ongoing over a period of months, and it

25   persisted even while he was facing drug trafficking charges in

1    state court.

2              THE COURT:  Thank you.

3              Mr. Hamilton, further comments?

4              MR. HAMILTON:  If the Court's -- so this is not a

5    presumption offense, and so if the Court is asking itself -- and

6    there's a higher standard to show dangerousness, clear and

7    convincing evidence, can the community be safe.

8              The allegations are during a particular period of

9    time.  There is no indication that the offense conduct described

10   in the indictment has been going on since Mr. Santillan, Jr.,

11   left the indictment.  So in that sense, he can be -- can we be

12   reasonably assured at his appearance and the safety of the

13   community?  The answer is yes.  There's no indication he had

14   previously engaged in such conduct, that he was the leader and

15   the organizer of such conduct.

16             He has been in Oregon and he is working a job and he

17   has a -- he has a residence and so -- and he can live with his

18   grandparents, his adoptive parents in California, if necessary.

19   But he has indicated he wants to stay here in Oregon, that he

20   started something new and he feels like he's building something

21   new, and so I'd like to ask the Court to release him here.

22             But when we're talking about dangerousness, I get what

23   is described in the indictment causes the Court concern, and

24   they're serious charges, but there is no indication such conduct

25   continued on or has been going on recently or that it will

1  continue to go on.

2          THE COURT:  Thank you.

3          I reviewed the indictment yesterday.  I don't have it

4  in front of me today.

5          Mr. Chernick, what is the time window of the

6  defendant's alleged involvement?

7          MS. CHERNICK:  I believe the last event was January of

8  2021.  And I am checking to make sure it's -- his involvement

9  began at least as early as May of 2020, but I'm making sure that

10 there's not a previous event involving him.  March of 2020.

11         THE COURT:  According to the indictment, at the time

12 of the conduct alleged, where was Mr. Santillan living?

13         MS. CHERNICK:  I believe that he was spending time in

14 both California and Nevada at that time.

15         THE COURT:  Is there any indication that any of the

16 conduct alleged in the indictment occurred after he relocated to

17 Oregon?

18         MS. CHERNICK:  I don't know, Your Honor, exactly when

19 he did relocate to Oregon.  I don't believe that that's --

20         THE COURT:  Do you know the answer to that?

21         MR. HAMILTON:  So March or April of 2021, and the

22 answer is, no, the indictment doesn't have anything in that time

23 period, after that time period.

24         MS. CHERNICK:  And if Your Honor is interested in

25 discussing more recent events indicative of how the defendant

might perform if released, I would like to address that.

THE COURT:  Go ahead.

MS. CHERNICK:  I think that we have a pretty good record or pretty compelling record of how this defendant would perform if released, and that comes from his performance while on -- while facing two different state cases or after conviction in those cases.

The first of those was the Oregon conviction dating back to 2019.  He was convicted in 2020, and as the pretrial trial services officer has noted, the defendant failed to appear for a probation violation, which resulted in a warrant issuing. And the probation officer in that case noted that the defendant had multiple violations of probation for use of methamphetamine and described his performance while on supervision as marginal.

We then have the Nevada case from 2020 of which he was convicted in 2021.  And we have -- I don't have any more information about this for the Court, but the pretrial services report reflects an arrest for a violation of probation or condition of suspended sentence from Nevada dating back just to two weeks ago or the week before last.

So unfortunately, there's no further information about that available, but it's indicative that this is not someone who has a history of following the conditions that have been placed on him while on supervision and has a failure to appear on his record.  And then additionally, as the Court has already noted,

1    both of these offenses take place during the time period when

2    he's also involved in the instant offense.

3              THE COURT:  Further comments, Mr. Hamilton?

4              MR. HAMILTON:  Yeah.  The thing in Nevada, I think it

5    reflects not a week or two ago.  That's from January 11th, 2021,

6    and that's the incident that's described.  So he's in custody,

7    he's sentenced.  You can see it in the section above that.  He's

8    sentenced on January 7th for 30 days custody with 22 days

9    custody for credit for time served.

10             My understanding is the Department of Public Safety

11   goes and checks the house before his release.  I understand

12   what -- this is saying arrest for a violation of probation,

13   condition of suspended sentence.  I don't know exactly why it

14   says that or the mechanics of it, but it was -- that was done

15   before he was released.  He's still in custody serving -- he had

16   eight more days to serve on 1/7/2021, and that entry is made on

17   1/11/2021.

18             Regarding the current Oregon stuff, as he admitted to

19   pretrial, he has not used methamphetamine in around six months,

20   which means prior to six months ago he was still struggling with

21   occasional methamphetamine use which reflects this earlier time

22   period on his Oregon supervision.

23             I note that the April 30th, 2021, failure to appear

24   warrant was rescinded by the court.  In state court, that is

25   often for a number of reasons, that people have significant or

1    an acceptable excuse and courts rescind warrants and let guys

2    come in, and that's what he got.

3            My understanding is he's currently reporting.  He's on

4    limited supervision, so -- but in terms of the last seven or

5    eight months, he's been doing well on supervision.  He holds a

6    really good job at Fleetwood Homes.  He gets $23 to $27 an hour

7    depending on how many hours he's working.  And he has a place to

8    live and he's doing well.

9            And he's got -- he's able to go -- he has a -- he can

10   stay at his grandparents' house when he goes down to court in

11   California.  They say he's welcome to live there always, but he

12   has -- he can get down to California, and he's doing well now in

13   Oregon, and I ask that he be released and be allowed to continue

14   the progress he's made.

15           I talked to his boss at work who said he's a good

16   worker and he's welcome back even though the feds arrested him

17   on his break at his job and it was sort of humiliating to him.

18   They said he's welcome to come back.

19           And so I ask that he -- I think he's currently in a

20   good place and I ask the Court -- I think there's conditions

21   that can reasonably assure his appearance and reasonably assure

22   the safety of the community.  He's willing to engage in

23   outpatient treatment and to do an assessment for that and do

24   whatever outpatient treatment is necessary.  And so I think he's

25   a good candidate and I think he'll report and do what he needs

1  to do.

2        THE COURT:  Thank you.

3        It is not a presumption case, that is correct.  So the

4  burden for flight is preponderance, and for risk to the

5  community is clear and convincing.

6        Based on the record, I don't think the defendant is a

7  flight issue.  I haven't heard anything that gives me concern.

8  And I know there are one or two failures to appear, but I do not

9  believe he has a flight issue.  The issue for me is danger to

10  the community if released.

11        MR. HAMILTON:  Judge Acosta, can I add one thing I

12  forgot about?

13        THE COURT:  Go ahead.

14        MR. HAMILTON:  On this issue of danger to the

15  community, it just strikes me as not entirely sincere on the

16  part of the government to say now that he shouldn't be released

17  because of danger to the community, but the government left him

18  out after -- after investigating this case and knowing about the

19  case and having the seizure in -- on July 31st, 2020.  They have

20  known where he is.  And they didn't even pick his dad up for a

21  while.

22        And so the conduct had stopped, and so for the

23  government to argue that -- it always strikes me as sort of

24  weird when the government knows the person's out and is fine

25  with the person being out and then tries to argue that to keep a

1  person in under the clear and convincing standard.

2          So I just wanted to add that.  Thank you.

3          THE COURT:  Thank you.

4          All right.  I find, on balance, that if released, the

5  defendant would not be a danger to the community because there

6  are conditions sufficient to assure the community's safety.

7  Those conditions are set forth in the pretrial officer's report.

8  There is a list of them.

9          I want to first ask the government if the government

10 wants conditions that are not recommended by pretrial added to

11 those that are recommended.

12          Ms. Chernick?

13          MS. CHERNICK:  Yes, Your Honor.  I would request a

14 significant surety to ensure that he makes his appearances and

15 follows the conditions imposed by the pretrial services office.

16          THE COURT:  Anything else?

17          MS. CHERNICK:  That's all.

18          THE COURT:  Thank you.

19          MS. CHERNICK:  And I would add, since I don't know if

20 I'll have another opportunity to, that the -- the Central

21 District of California, the charging district, has requested

22 that I request a stay if Your Honor orders the defendant

23 released so that they can consider appealing that decision.  And

24 I understand that that's a decision that's up to you, but I

25 wanted to convey that request from the charging district.

1          THE COURT:  Thank you.

2          I'm not going to require a bond.  I will release him

3   under the conditions recommended by pretrial services.  I'll

4   stay that order for 24 hours.  The charging district, Central

5   District of California, should know by then whether it wishes to

6   appeal or not.

7          In the event there is no appeal or there is an appeal

8   and my decision is upheld, Mr. Santillan, you're going to be

9   given a list of conditions that you will be required to comply

10  with on your release.

11         I'm going to highlight a few of them to make sure that

12  you understand what your obligation is under this release order

13  that I will sign.

14         First, you can't have any contact with any of the

15  co-defendants.  That means two things:  You can't initiate

16  contact with them.  That's easy for you to control.  Just don't

17  call them or email them or text them or post on their Facebook

18  page.  Don't send a message or a note through a third person.

19  Don't contact them in any way.

20         THE DEFENDANT:  Understood.

21         THE COURT:  The other thing no contact means is that

22  if they try to contact you, you may not engage with them.  You

23  will not get in trouble if a co-defendant tries to contact you.

24  You will get in trouble if you respond in any way.

25         THE DEFENDANT:  Okay.

1          THE COURT:  So if they send you an email, don't

2   respond.  If they call you, hang up.  If they show up on your

3   doorstep or at your place of employment, do not talk with them.

4   Walk away.  If they try to post on your Facebook page or contact

5   you by social media or contact you through a third person, do

6   not respond.  Tell your lawyer and tell your pretrial officer.

7   Let them handle it.  If you resort to self-help, that will get

8   you in trouble and you will likely be revoked.

9          Do you understand that?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  You're going to participate in an alcohol

12   and drug assessment.  I understand that you may have stopped

13   using methamphetamine six months ago, but you're still a daily

14   user of marijuana, and as you might know, under federal law,

15   marijuana is a controlled substance.

16          But I am still concerned about the methamphetamine use

17   as well as the marijuana use.  In my experience on the bench,

18   people who use -- people who use controlled substances often

19   make poor decisions when it comes to things like criminal

20   behavior.  So you will have to undergo that assessment as

21   directed by pretrial and follow any directives that pretrial

22   gives you with respect to drug and alcohol treatment.

23          THE DEFENDANT:  Okay.

24          THE COURT:  Your travel is limited to Oregon.  And for

25   purposes of court visitation -- sorry -- court hearings to the

1    Central District of California, for the purpose of attending

2    court hearings.

3              So what that means is this:  You may not leave the

4    state boundary of the state of Oregon.  Those are the same

5    boundaries for the District of Oregon's federal court.

6              I want to be clear about one thing.  Vancouver across

7    the river is not Oregon.  If you go across state lines, I will

8    revoke you.  That is a deal breaker.

9              Understood?

10             THE DEFENDANT:  It's understood, sir.

11             THE COURT:  If you go to California, it can be only to

12   attend court hearings or to meet with your lawyer in the case in

13   the charging district and you must return to Oregon as soon as

14   that business is concluded.  No sticking around in the Central

15   District of California to meet with family, go to a movie, spend

16   the weekend at the beach.  None of that.

17             Understood?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  If you have questions at any time about

20   the conditions, what they mean, what they prohibit you from

21   doing, what they allow you to do, ask your lawyer or your

22   pretrial officer.  Don't make an assumption.  That will get you

23   in trouble.

24             One other thing.  I've found in my time on the bench

25   nothing goes without saying, but one of the conditions is going

```
 1   to be you may not own, possess, or control any firearm.  That
 2   means you can't buy a gun, you can't handle a gun, and you can't
 3   be in the same vicinity as a gun because that conceivably gives
 4   you control over the firearm.
 5            So let me just give you one example.  Don't get in a
 6   car with somebody you suspect might have a gun, because if that
 7   car gets pulled over and you get arrested, you're going to
 8   get -- you will have violated your conditions of release.
 9            Understood?
10            THE DEFENDANT:  Yes, sir.
11            THE COURT:  And that will have to be sorted out either
12   in this case or in a separate case.
13            Do you have any questions about the things I've said
14   to you?
15            THE DEFENDANT:  No, I do not.
16            THE COURT:  Ms. Chernick, assuming that my release
17   order is upheld and Mr. Santillan is released pending further
18   proceedings, if there is any violation, alleged violation of my
19   conditions of release, you are to bring those to me regardless
20   of which judge is on mag court that day.
21            MS. CHERNICK:  Understood, Your Honor.
22            THE COURT:  Mr. Santillan, here's why I'm doing that.
23   I do that from time to time in cases.  I will remember what I
24   told you.  If you violate any of my orders and you give me an
25   excuse, an explanation, some sort of discussion that doesn't add
```

1    up, I'm putting you in jail.

2             Understood?

3             THE DEFENDANT:  Yes, sir.

4             THE COURT:  All right.  Mr. Hamilton, is there

5    anything else?

6             MR. HAMILTON:  Your Honor, I noticed in the paperwork

7    the Court sent the other day, I think I saw a court date of

8    February 2nd.

9             THE COURT:  You're right.

10            MR. HAMILTON:  And I have the address on that and I

11   just want to be sure maybe that that's on the record.  And I can

12   get him the paperwork, I just want to make sure, if he gets out

13   of custody -- it's easy for him to fly down there, but I just

14   want to make sure he gets that date.

15            THE COURT:  You know, I apologize.  I do not have

16   that.  I usually have that Rule 5 paperwork in front of me.  So

17   I don't have the date, time, and place of the next appearance.

18   Mr. Hamilton, can you read that into the record?

19            MR. HAMILTON:  Yeah.  The one I have, the order

20   requiring defendant to appear, is February 2nd, 2022, at

21   1:00 p.m., and it's in courtroom 880, and that's at the federal

22   building and US courthouse in Los Angeles.  That's 255 East

23   Temple Street.  So when that gets signed and in the record, I'll

24   get a copy to Mr. Santillan.

25            THE COURT:  Thank you.

1           Mr. Santillan, I want to be clear about what that

2   means.  At that time on that date at that place, you have to be

3   there.  Work backwards, then, to figure out how long it's going

4   to take you to get from Oregon to California and to get from

5   wherever it is you're going to stay to the courthouse.  Don't be

6   late.  If you are late, my guess is they're going to issue a

7   warrant for your arrest.

8           Understood?

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  And when you are -- when you have made

11  your travel arrangements, you are to inform your pretrial

12  officer when you're leaving, where you will be staying, and when

13  you will be coming back.

14          Understood?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Officer McGlothen, anything else?

17          MR. McGLOTHEN:  Not at this time, Your Honor.  Thank

18  you.  I'll send the release order to you right now and you can

19  sign it, and if there's a stay that's happening, then we'll take

20  it from there.

21          THE COURT:  Thank you.

22          Mr. Santillan, you can tell the officer there that

23  your hearing is finished.

24

25      (The proceedings concluded at 2:08 p.m.)

1                        C E R T I F I C A T E

2

3            I certify, by signing below, that the foregoing is a

4    true and correct transcript, to the best of my ability, of the

5    videoconference/telephonic hearing taken by stenographic means.

6    Due to the videoconference/telephonic connection, parties

7    appearing via videoconference, speakerphone or cell phone,

8    speakers overlapping when speaking, speakers not identifying

9    themselves before they speak, fast speakers, the speaker's

10   failure to enunciate, and/or other technical difficulties that

11   occur during videoconference/telephonic proceedings, this

12   certification is limited by the above-mentioned reasons and any

13   technological difficulties of such proceedings occurring over

14   the videoconference/speakerphone at the United States District

15   Court of Oregon in the above-entitled cause.  A transcript

16   without an original signature, conformed signature, or digitally

17   signed signature is not certified.

18

19            DATED this 24th day of January, 2022.

20

21                              // Ryan White
                                _____
22                              RYAN WHITE
                                Registered Merit Reporter
                                Certified Realtime Reporter
23                              Expires 9/30/2022
                                Washington CCR No. 3220
24                              Expires 10/25/2022
                                Oregon CSR No. 10-0419
25                              Expires 12/31/2023